UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ABRE JACKSON (M36475), | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 20 C 6004 |
| v. | ) | |
| | ) | Judge Sara L. Ellis |
| DAVE VASQUEZ, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

Plaintiff Abre Jackson, an inmate currently incarcerated at Pontiac Correctional Center ("Pontiac"), brings this action pursuant to 42 U.S.C § 1983 alleging violations of the Eighth Amendment against Defendants Marc Anastacio, Laith Elhaj, and Shadi Awad (the "Stateville Defendants"), and his due process rights against Defendants Travis Bantista, Jesus Madrigal, and Leonta Jackson (the "Pontiac Defendants"). Defendants move for summary judgment on the merits of Jackson's Eighth Amendment claim against Awad and his due process claim against the Pontiac Defendants. As to all asserted claims, Defendants argue that qualified immunity shields them from liability. Because disputed questions of material fact exist regarding the Stateville Defendants' use of force and Awad's opportunity to intervene, Jackson's Eighth Amendment claim survives. However, because Jackson has not established a liberty interest sufficient to trigger due process protections, the Court grants Defendants' motion for summary judgment on his due process claim.

## BACKGROUND[1]

Before his incarceration at Pontiac, Jackson resided at Stateville Correctional Center ("Stateville"). While at Stateville, on February 25, 2020, Jackson had an encounter with Officer Penrod and the Stateville Defendants. Penrod approached Jackson's cell to close its chuckhole door, a small opening on the door to the cell. Jackson could fit both of his arms, but no other parts of his body, through the door. As Penrod reached for the chuckhole door, Jackson placed one of his arms through it. Elhaj thereafter approached the cell and attempted to help Penrod close the chuckhole door. Jackson testified that an officer grabbed his arms and banged them against the cell door and that Elhaj forcefully bent his middle finger. Video footage depicts Elhaj grabbing Jackson's arm to get it back into his cell, but Penrod's body obscures most of the rest of the parties' interaction. A few seconds later, Anastacio approached the cell, shaking a chemical agent in his right hand. Jackson asserts that Anastacio ground the spray canister into Jackson's hand; the video neither conclusively establishes nor refutes this. Around 30 seconds after that, Awad approached the cell door and began speaking to the officers. Jackson recalls that Awad alerted the other officers to the presence of a camera and told them to stop. Awad never touched Jackson. Moments later, Jackson broke free of the officers' grasps, after which Anastacio discharged a chemical agent into Jackson's cell. Jackson states that Anastacio continued spraying the chemical agent at Jackson after he retreated completely into his cell. Defendants dispute this, but the video does not conclusively resolve the dispute. The entire interaction lasted just over one minute; after that, Penrod secured the chuckhole door. Jackson

---

[1] The Court derives the facts in this section from the parties' Joint Statement of Undisputed Material Facts and exhibits attached thereto. The Court has considered Jackson's additional facts and supporting exhibits and included in this background section only those portions relevant to resolution of the pending motion that Jackson appropriately presented and supported. The Court takes all facts in the light most favorable to Jackson, the non-movant.

avers that he received medical attention at Stateville before being transferred to Pontiac for unknown reasons. Jackson also received medical attention upon arrival at Pontiac.

As a result of the February 25th incident, Anastacio issued Jackson a disciplinary ticket for a major infraction. On March 13, 2020, Jackson attended an adjustment committee hearing at Pontiac in connection with the ticket. The hearing committee, consisting of Defendants Bantista and Madrigal (the "Hearing Committee"), permitted Jackson to ask questions and tell his side of the story. Jackson states that they precluded him from calling witnesses or viewing the video of the incident. After the hearing, the Hearing Committee recommended disciplinary action and provided reasoning for their decision. Jackson's disciplinary requirements, as reflected by the Hearing Committee's final summary report, consisted of three months C grade status,[2] three months segregation, revoke GCC or SGT (also known as good time credit) one month (later reduced to zero), three months commissary restriction, three months audio/visual restriction, and six months contact visits restriction. The Hearing Committee based their decision on the observations of Anastacio and Elhaj. Leonta Jackson ("Leonta") approved the Hearing Committee's determination.

On March 18, 2020 and April 13, 2020, Jackson filed his first and second grievances related to the February 25th incident. Jackson did not mention his March 13th disciplinary hearing in either grievance.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To determine whether a genuine dispute of material fact exists, the Court must pierce the

---

[2] For an Illinois prisoner, "C" grade status "entails the loss of privileges (except yard access), restricted commissary access, and only video-based visits." *Miller v. Maue*, 759 F. App'x 515, 515–16 (7th Cir. 2019) (citing ILL. ADMIN. CODE tit. 20, § 504.130(a)(3)).

pleadings and assess the proof as presented in depositions, documents, answers to

interrogatories, admissions, stipulations, and affidavits or declarations that are part of the record.

Fed. R. Civ. P. 56(c)(1); *A.V. Consultants, Inc. v. Barnes*, 978 F.2d 996, 999 (7th Cir. 1992).

The party seeking summary judgment bears the initial burden of demonstrating that no genuine

dispute of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Bunn v. Fed.*

*Deposit Ins. Corp. for Valley Bank Ill.*, 908 F.3d 290, 295 (7th Cir. 2018). In response, the non-

moving party cannot rest on mere pleadings alone but must use the evidentiary tools listed above

to identify specific material facts that demonstrate a genuine dispute for trial. Fed. R. Civ. P.

56(c)(1); *Celotex*, 477 U.S. at 324; *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 627

(7th Cir. 2014). The Court must construe all facts in the light most favorable to the non-moving

party and draw all reasonable inferences in that party's favor. *Wehrle v. Cincinnati Ins. Co.*, 719

F.3d 840, 842 (7th Cir. 2013). However, a bare contention by the non-moving party that an issue

of fact exists does not create a factual dispute, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th

Cir. 2000), and the non-moving party is "only entitled to the benefit of inferences supported by

admissible evidence, not those 'supported by only speculation or conjecture,'" *Grant v. Trs. of*

*Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (citation omitted).

## ANALYSIS

### I.    Eighth Amendment Claim

Jackson asserts that Elhaj and Anastacio violated his Eighth Amendment rights when

they used excessive force to injure his arm and finger and sprayed him with a chemical aerosol.

Jackson also asserts that Awad, who did not himself inflict any force, failed to intervene in

preventing the use of excessive force. Defendants do not challenge Jackson's excessive force

claim on the merits against Elhaj and Anastacio; instead, they raise a qualified immunity defense,

4

which the Court addresses *infra*. Defendants do challenge the claim as asserted against Awad however and construe Jackson's theory of liability as one alleging failure to protect. Defendants move for summary judgment on the basis that Awad "did not act with deliberate indifference" toward Jackson when he witnessed the incident, evidenced by the fact that Awad told the other officers to stop. Doc. 50 at 4 (citing the standard for "an Eighth Amendment failure to protect claim").

Defendants misconstrue Jackson's claim, which the Court instead interprets as an allegation of failure to intervene—a theory of liability that allows a plaintiff to prove the liability of an official who did not directly participate in the challenged wrong. *See Watkins v. Ghosh*, No. 11 C 1880, 2014 WL 840949, at *3 (N.D. Ill. Mar. 4, 2014) ("The Seventh Circuit acknowledges a 'failure to intervene' basis for a constitutional violation under the Eighth Amendment." (citing *Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005)); *Fields v. City of Chicago*, No. 10 C 1168, 2014 WL 477394, at *10 (N.D. Ill. Feb. 6, 2014) ("Failure to intervene is not a claim for relief; rather, it is a theory of liability under section 1983, specifically, a way to prove the liability of a state actor who was not a direct participant in the challenged wrongdoing."); *cf. Kyles v. Beaugard*, No. 15 C 8895, 2017 WL 2559038, at *4 (N.D. Ill. June 13, 2017) (considering a failure to protect claim where another inmate assaulted the plaintiff and explaining that "[c]orrectional officials have a duty to protect inmates from violent assaults by *other inmates*" (emphasis added)). A plaintiff may prevail against an officer who did not himself infringe on the plaintiff's rights if the officer failed to prevent another officer from violating those rights despite a "realistic opportunity to intervene to prevent the harm from occurring." *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994). "Whether an officer had sufficient time to intervene or was capable of preventing the harm caused by the other officer is generally an issue

for the trier of fact unless, considering all the evidence, a reasonable jury *could not possibly conclude otherwise*." *Abdullahi v. City of Madison*, 423 F.3d 763, 774 (7th Cir. 2005) (citation omitted).

Here, a reasonable jury could conclude that Awad had a realistic opportunity to intervene to prevent the harm from occurring. First, he instructed the other officers to stop, which evinces an opportunity to intervene. *See* Doc. 13 ¶ 30 ("Mr. Awad visited the scene, observed the actions of Mr. Elhaj and Sgt. Anastacio, [and] advised them to stop with a reminder that a mounted camera was capturing their activities[.]"); *Abdullahi*, at 774 (explaining that "a realistic opportunity to intervene may exist whenever an officer could have called for a backup, called for help, or at least cautioned [the excessive force defendant] to stop" (alteration in original) (citation omitted) (internal quotation marks omitted)). Defendants assert that because Awad told the officers to stop, Jackson's claim must fail. Jackson, however, argues that Awad's directive did not suffice. He states that Awad did nothing further to attempt to stop the other officers from their ongoing use of force. Although the video footage of the incident does not establish this, it does not conclusively refute Jackson's version of events, and the Court cannot make a credibility determination at this stage. *See Abdullahi*, 423 F.3d at 773 ("At summary judgment a court may not assess the credibility of witnesses, choose between competing inferences or balance the relative weight of conflicting evidence[.]" (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986))). Moreover, the video footage does depict Awad at or near the scene while the other officers continued to interact with Jackson. *See* Doc. 53. Construing the facts in a light most favorable to Jackson, a jury could find that Awad "fail[ed] to take reasonable steps to attempt to stop the use of excessive force . . . by his fellow officers." *Powell v. City of Berwyn*, 68 F. Supp. 3d 929, 941 (N.D. Ill. 2014) (quoting *Sanchez v. City of Chicago*, 700 F.3d 919, 925–26 (7th Cir.

2012)); *see also Olmo v. Paterson Police Dep't*, No. CV 16-9414 (JMV), 2018 WL 1806054, at

*6 (D.N.J. Apr. 17, 2018) ("If true [that bystander officers had the time and ability to try to stop

behaviors of offending officer], then the [bystander officers] would have a duty to take

reasonable steps to protect the Plaintiff from the [offending] Officer's use of excessive force.");

7th Cir. Pattern Civil Jury Instructions 7.22 ("To succeed on his failure to intervene claim against

Defendant, Plaintiff must prove[,] . . . by a preponderance of the evidence . . . Defendant failed to

take reasonable steps to prevent harm from occurring.").  Therefore, the Court denies

Defendants' motion on the merits of Jackson's Eighth Amendment claim against Awad.

Defendants also assert, however, on behalf of all Stateville Defendants, that qualified

immunity shields them from liability on Jackson's Eighth Amendment claim.  "Qualified

immunity attaches when an official's conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known."  *White v. Pauly*, 580 U.S.

73, 78–79 (2017) (citation omitted) (internal quotation marks omitted).  The Court must ask

"(1) whether the facts alleged, taken in the light most favorable to the plaintiff, amount to a

constitutional violation; and (2) whether the constitutional right at issue was clearly established

at the time of the alleged violation."  *McComas v. Brickley*, 673 F.3d 722, 725 (7th Cir. 2012).  If

the Court answers "yes" to both questions, then qualified immunity will not shield the Stateville

Defendants.

Turning to the first question, the facts in the record, when considered in a light most

favorable to Jackson, amount to a constitutional violation.  "The Eighth Amendment prohibits

unnecessary and wanton infliction of pain, thus forbidding punishment that is so totally without

penological justification that it results in the gratuitous infliction of suffering."  *Leiser v. Kloth*,

933 F.3d 696, 703 (7th Cir. 2019) (citations omitted) (internal quotation marks omitted).

Correctional officers violate the Eight Amendment when they use force "maliciously and sadistically" to cause harm, rather than in a "good faith effort to maintain or restore discipline." *Wilborn v. Ealey*, 881 F.3d 998, 1006 (7th Cir. 2018).

As to Elhaj and Anastacio, Defendants argue that they acted reasonably when they attempted to secure Jackson's chuckhole door using reasonable force, as purportedly shown in the video of the incident. First, these contentions do little more "than gesture in the general direction of the record and make conclusory assertions about what the record shows," which does not suffice to establish a qualified immunity defense. *See Ortiz v. City of Chicago*, No. 09-CV-2636, 2010 WL 3833962, at *13 (N.D. Ill. Sept. 22, 2010) ("[Q]ualified immunity on the excessive force claim is not available—at least at this time—based on a murky factual picture and underdeveloped briefing."). In any event, Jackson asserts that Elhaj slammed his forearm against the cell door frame and bent his finger backwards, that Anastacio ground his chemical spray canister into Jackson's hand and thereafter sprayed the chemical into Jackson's face and chest, and that, even after he retreated completely into his cell, Anastacio continued to spray him with the chemical agent. After the incident, Jackson claims he received medical attention from both Pontiac and Stateville to address his injuries.[3] A reasonable jury viewing the video footage could believe the Stateville Defendants' version of events and conclude that they acted reasonably; however, the footage could also support Jackson's recollection of the incident. And if the incident in fact occurred as Jackson claims, a jury could conclude that Elhaj and Anastacio violated Jackson's Eighth Amendment rights. *See Soto v. Dickey*, 744 F.2d 1260, 1270 (7th Cir.

---

[3] In their reply brief, Defendants contend that Jackson has not provided evidence that Defendants acted unreasonably or in violation of clearly established rights, despite his "self-serving" declaration. However, the Court will not discredit Jackson's recollection of the facts merely because he provided them in a "self-serving" declaration. *See Hill v. Tangherlini*, 724 F.3d 965, 967 (7th Cir. 2013) (finding the district court erred when it discredited plaintiff's testimony due to its "self-serving" nature because "testimony, affidavits, responses to interrogatories, and other written statements by their nature are self-serving").

1984) ("[I]t is a violation of the Eighth Amendment for prison officials to use mace or other chemical agents in quantities greater than necessary or for the sole purpose of punishment or the infliction of pain."); *Moore v. Andrews*, No. 2:20-CV-00124-JRS-MG, 2022 WL 672750, at *5 (S.D. Ind. Mar. 7, 2022) (allowing Eighth Amendment claim to proceed where genuine issues of material fact existed as to defendant's "intent when he administered the second burst of pepper spray—that is, whether it was a good-faith effort to restore discipline or a malicious and sadistic act"). The Court has already decided that a genuine dispute of material fact exists regarding whether Awad's behavior constitutes a failure to intervene in violation of the Eighth Amendment. Therefore, the Court cannot resolve the first prong of the qualified immunity assessment in favor of the Stateville Defendants. *See Cyrus v. Town of Mukwonago*, 624 F.3d 856, 862 (7th Cir. 2010) ("[S]ummary judgment is often inappropriate in excessive-force cases because the evidence surrounding the officer's use of force is often susceptible of different interpretations.").

Turning to the second prong of the qualified immunity inquiry, the Court considers whether the officers would have realized that they acted unlawfully, construing the facts in a light most favorable to Jackson. "Clearly established means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *Gupta v. Melloh*, 19 F.4th 990, 1000 (7th Cir. 2021) (citation omitted) (internal quotation marks omitted). As to Defendants Elhaj and Anastacio, despite their conclusory assertions that they "had no reason to believe their actions were unlawful," Doc. 50 at 10, "[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated . . . whether or not significant injury is evident," *Moore*, 2022 WL 672750, at *5 (citing *McCottrell v. White*, 933 F.3d 651, 664 (7th Cir. 2019)).

Because genuine disputes of fact exist regarding Elhaj and Anastacio's use of force, qualified immunity does not shield them from liability at this stage. *See id.* (declining to grant summary judgment on qualified immunity grounds where the facts, when construed favorably to the plaintiff, demonstrated an Eighth Amendment violation); *Gupta*, 19 F.4th at 1000 ("[W]here there are disputes of material fact about the level of force used and the amount of force necessary that are essential to the question of the reasonable use of force . . . it is impossible to conclude on summary judgment whether [defendant is] entitled to qualified immunity.").

As to Awad, the Court must consider whether it would have been clear to an officer in his position that the others employed excessive force, thus triggering a duty to intervene. As discussed above, questions of material fact exist regarding the extent and nature of Elhaj and Anastacio's use of force. But if the events unfolded as Jackson contends, then a jury could conclude that Awad should have taken more steps to prevent or suppress the other officers' use of force. *See Ellis v. Shurtz*, No. 15-1155-SMY-RJD, 2018 WL 747425, at *3 (S.D. Ill. Feb. 7, 2018) ("At the time the underlying incidents occurred, it was clearly established law that correctional officers, who have a realistic opportunity to step forward and prevent a fellow officer from violating a plaintiff's right through the use of excessive force but fail to do so, may be held liable."); *Trepanier v. Davidson*, No. 03 C 6687, 2006 WL 1302404, at *14 (N.D. Ill. May 5, 2006) (finding a question of fact as to whether a reasonable officer would have thought he had a duty to intervene where, "[i]f the events unfolded as Plaintiff alleges, the acts of excessive force could . . . be understood by the jury to have taken place over an extended time period and to have occurred in observable ways"). At trial, Awad "will be able to present evidence showing that there was no cause to intervene, or that there was no reasonable opportunity for intervention or no reasonable method to intervene." *Trepanier*, 2006 WL

10

1302404, at *14 (citing *Yang*, 37 F.3d at 286). At this stage, the Stateville Defendants have not established their entitlement to qualified immunity. Therefore, Jackson's Eighth Amendment claim survives.

## II. Due Process Claim

Jackson asserts that the Hearing Committee and Leonta violated his rights under the Fourteenth Amendment when they placed him in disciplinary segregation for three months, along with ordering other disciplinary actions, without sufficient process.[4] Defendants move for summary judgment on the bases that Jackson's segregation did not trigger due process protections and, even if it did, the Hearing Committee satisfied all due process requirements in Jackson's hearing. With respect to Leonta, Defendants argue that the Court should independently grant their motion because he did not know of or participate in any of the alleged due process violations. To proceed on his due process claim based on his disciplinary hearing, Jackson must demonstrate (1) the deprivation of a liberty interest, and (2) constitutionally deficient procedures. *Lisle v. Welborn*, 933 F.3d 705, 720 (7th Cir. 2019) (citation omitted). Because Jackson has not identified deprivation of a liberty interest based on the record, the Court need not consider the procedures afforded by Defendants. *See Rodriguez v. Veath*, No. 3:15-CV-36-NJR-DGW, 2017 WL 1197241, at *9 (S.D. Ill. Mar. 31, 2017) ("Because no reasonable factfinder could find that Rodriguez's stint in segregation implicated a constitutionally protected liberty interest, the Court need not consider whether the procedures followed during his Adjustment Committee hearing were deficient.").

---

[4] The Court's analysis focuses on disciplinary segregation, rather than on the other disciplinary actions imposed by the Hearing Committee, because Jackson focuses his response on disciplinary segregation and the record does not contain sufficient evidence suggesting that the other actions would trigger due process protections. *See, e.g.*, *Miller*, 759 F. App'x at 516 ("[W]e have already ruled that deprivations upon demotion to C grade status do not implicate a liberty interest.").

Disciplinary segregation may implicate due process concerns only where the conditions of detention impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995). In assessing whether disciplinary segregation triggers due process protections, courts consider "the duration and conditions of segregation." *Marion v. Columbia Corr. Inst.*, 559 F.3d 693, 697 (7th Cir. 2009) (citing *Wilkinson v. Austin*, 545 U.S. 209, 224 (2005)). "The length of confinement must be 'substantial' and the conditions of confinement 'unusually harsh.'" *Miller*, 759 F. App'x at 516 (citing *Marion*, 559 F.3d at 698). The length of Jackson's disciplinary segregation—three months—does not on its own implicate the Fourteenth Amendment. *See Hardaway v. Meyerhoff*, 734 F.3d 740, 743 (7th Cir. 2013) (six month and one day segregation insufficient to trigger due process protections); *Trainauskas v. Fralicker*, No. 18-CV-00193-SPM, 2021 WL 1171674, at *5 (S.D. Ill. Mar. 29, 2021) ("[F]our months of segregation . . . is not such an extreme term and, standing alone, would not trigger due process rights."); *Bentz v. Atchinson*, No. 314CV01132SMYRJD, 2017 WL 5999054, at *7 (S.D. Ill. Dec. 4, 2017) ("[N]either the Seventh Circuit nor the Supreme Court has specifically held that a 90 day period of segregation constitutes an atypical and significant hardship."). However, if Jackson suffered unusually harsh conditions of confinement or additional punishments, he may successfully establish a violation. *Kervin v. Barnes*, 787 F.3d 833, 836–37 (7th Cir. 2015) (explaining that a period of segregation shorter than six months "may, depending on the conditions of confinement and on any additional punishments, establish a violation"); *Nichols v. Best*, No. 15 C 2946, 2017 WL 3872488, at *4 (N.D. Ill. Sept. 5, 2017) ("It is true that the Seventh Circuit has recently taken issue with courts considering any segregation confinement less than six months to be too short to implicate a liberty interest."). *But see Smith v. Akpore*, 689 F. App'x 458, 460 (7th Cir. 2017) (finding

plaintiff's "approximately 3 months in disciplinary segregation were not long enough to raise a concern under the Due Process Clause" without considering conditions of segregation).[5] Although neither the Supreme Court nor the Seventh Circuit has "established a clear, bright line standard for determining how harsh prison conditions must be to constitute an atypical and significant hardship," *Moore v. Hughes*, No. 15-CV-0092-MJR-RJD, 2017 WL 1233855, at *4 (S.D. Ill. Apr. 4, 2017) (citing *Kervin*, 787 F.3d at 835–37), considerations include human contact and access to facilities, *see Wilkinson*, 545 U.S. at 224 (finding a liberty interest where conditions included, indefinitely, almost no human contact, 24-hour lighting, no parole eligibility, and one permitted hour of exercise, but acknowledging that "any of these conditions standing alone might not be sufficient"); *Hardaway*, 734 F.3d at 744 ("[P]risoners' liberty interests will be implicated when they are placed in segregation that deprives them of virtually all sensory stimuli or human contact for an indefinite period of time.").

Here, Jackson asserts in his statement of additional facts that his disciplinary segregation cell, unlike the general population area, had feces and urine on the walls, constant noise with inmates banging on cell doors, water contaminated with bacteria that causes Legionnaires' disease, and roaches and mice. He also states that inmates in the disciplinary segregation cells, unlike inmates in general population, throw feces and urine at other inmates while they pass by

---

[5] The Seventh Circuit has described the appropriate benchmark for assessing whether a plaintiff suffered from "unusually harsh" segregation conditions differently in various opinions. Some opinions contend that courts should compare conditions in disciplinary segregation with conditions in nondisciplinary segregation (*e.g.*, segregation for administrative or protective purposes) rather than with conditions in the general prison population because "in every state's prison system, any member of the general prison population is subject, without remedy, to assignment to administrative segregation or protective custody at the sole discretion of prison officials" and therefore, "the conditions of discretionary segregation provide the most apt benchmark." *Lekas v. Briley*, 405 F.3d 602, 609 (7th Cir. 2005) (citing *Wagner v. Hanks*, 128 F.3d 1173, 1175 (7th Cir.1997)). Others, however, suggest that courts should use the ordinary conditions of a high-security prison as the benchmark. *See Kervin*, 787 F.3d at 836 ("[T]he right comparison is between the ordinary conditions of a high-security prison in the state, and the conditions under which a prisoner is actually held." (citing *Marion v. Radtke*, 641 F.3d 874, 876 (7th Cir. 2011))). Because Jackson has not demonstrated that he suffered atypical and significant hardship in either case, the Court need not decide the appropriate benchmark.

the cells to attend hearings, reach the shower, or to attend mental health treatment. As a threshold matter, Defendants move to strike these facts because Jackson did not allege them in his complaint, citing to cases wherein courts prevented plaintiffs from adding new claims or amending their complaints in response to the defendants' summary judgment motions. *See Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996) ("[Plaintiff's] attempt to amend his complaint by way of a footnote in his response to defendants' motion for summary judgment was properly denied by the district court."); *Bassiouni v. C.I.A.*, No. 02 C 4049, 2004 WL 1125919, at *8 (N.D. Ill. Mar. 31, 2004) (rejecting plaintiff's attempt to raise a new claim and argument in opposition to defendant's motion for summary judgment), *aff'd*, 392 F.3d 244 (7th Cir. 2004). However, Jackson neither proffers new claims nor attempts to amend his complaint; he merely provides facts based on personal knowledge in order to support a claim already in his complaint—Defendants' purported violation of his due process rights. Moreover, Defendants' assertion does not comport with this Court's summary judgment procedures, which provide that a non-movant may include facts in his response demonstrating a genuine issue of material fact and must cite supporting materials—as Jackson does here. *See* Judge Sara L. Ellis, Case Procedures, Summary Judgment Practice, http://www.ilnd.uscourts.gov/judge-info.aspx?VyU/OurKKJRDT+FUM5tZmA==; *see also Sweatt v. Union Pac. R.R. Co.*, 796 F.3d 701, 711–12 (7th Cir. 2015) (affirming this Court's summary judgment case management procedures); *McKinney v. Off. of Sheriff of Whitley Cnty.*, 866 F.3d 803, 814 (7th Cir. 2017) ("Our cases for at least the past fifteen years teach that [s]elf-serving affidavits can indeed be a legitimate method of introducing facts on summary judgment." (citation omitted) (internal quotation marks omitted)); *Lake v. Litscher*, No. 02-C-0964, 2006 WL 2168824, at *2 (E.D. Wis. July 31, 2006) (rejecting defendants' argument that the court should disregard information in

14

plaintiff's response "beyond that which he presented in his complaint" in part because local rule allowed non-movants to include affidavits in response to summary judgment motions and defendants had an opportunity to respond to plaintiff's affidavit in their reply brief). And, as expressly contemplated by the Court's rules, Defendants could have "respond[ed] to these facts in [their] reply." Judge Sara L. Ellis, Case Procedures, Summary Judgment Practice; *see also Lake*, 2006 WL 2168824, at *2 (finding defendants did not suffer prejudice where they "could have responded to this information in their reply brief").

However, even construing the facts in the light most favorable to Jackson, when coupled with his relatively short segregation time, he has not sufficiently raised a genuine issue of material fact regarding whether he suffered "atypical and significant hardship." *See Obriecht v. Raemisch*, 565 F. App'x 535, 540 (7th Cir. 2014) ("Although Obriecht submitted a declaration recounting deplorable conditions (in particular having to sleep on a mattress placed directly on the wet floor), he was released from segregation after only 78 days."); *Whitfield v. Atchingson*, No. 13-CV-653-SMY-RJD, 2017 WL 3707180, at *5 (S.D. Ill. Aug. 28, 2017) (finding no deprivation of a protected liberty interest where plaintiff's segregation lasted three months, with conditions including a steel door, cellmates with mental health issues, unpleasant odors, constant noise, and other inmates throwing feces at him); *cf. McKinley v. Atchison*, No. 3:16-CV-661-NJR-MAB, 2019 WL 4744839, at *7 (S.D. Ill. Sept. 30, 2019) (finding conditions including mice and cockroach infestation, cracked window, no heat, no hot water for months on end, and no cleaning supplies implicated plaintiff's due process rights where conditions lasted more than three years); *Basemore v. Brookman*, No. 16-CV-562-SMY-RJD, 2018 WL 1366587, at *3 (S.D. Ill. Mar. 16, 2018) (conditions including mold, mice, other inmates throwing feces, and banging on doors potentially constituted "atypical and significant hardship," even though general

population at Pontiac experienced similar conditions, where plaintiff's segregation lasted nine

months). Although Jackson describes deplorable conditions of confinement, poor conditions of

confinement do not necessarily give rise to a due process claim, particularly when coupled with a

shorter segregation period. *See Hopkins v. Klindworth*, 556 F. App'x. 497, 499 (7th Cir. 2014)

(finding "allegations concerning the extreme cold air stated an Eighth Amendment claim," but

affirming dismissal of due process claim based on same allegations where plaintiff's segregation

lasted 16 days); *Obriecht*, 565 F. App'x at 540 (although the "deplorable conditions" of

plaintiff's 78-day segregation did not suffice for due process claim, he "might have challenged

the conditions . . . under the Eighth Amendment"); *Nichols*, 2017 WL 3872488, at *5 (explaining

that although "increased exposure to cold" during 60-day confinement period may implicate the

Eighth Amendment, "it was not sufficiently harsh or atypical from ordinary prison life."). Here,

Jackson does not claim that he experienced "significant psychological or other injury" resulting

from his segregation, *Kervin*, 787 F.3d at 837, nor that segregation deprived him of all, or even

some, human contact or sensory stimuli.[6] *See Stallings v. Best*, No. 16 C 11063, 2018 WL

4300488, at *6 (N.D. Ill. Sept. 10, 2018) ("While indefinite placement in an environment

designed to deprive a prisoner of human contact or sensory stimuli, along with revocation of

parole eligibility [constitutes atypical and significant hardship,] . . . mere exposure to unsavory

conditions worse than those experienced in general population housing generally will not."

(citing *Wilkinson*, 545 U.S. at 224 and *Hardaway*, 734 F.3d at 744)). Because Jackson has not

raised, based on evidence in the record, a genuine dispute of material fact regarding his liberty

---

[6] Although Jackson testified that he suffers from bipolar affective disorder and posttraumatic stress
disorder, he has not asserted what effect, if any, his disciplinary segregation had on these disorders.

interest, the Court grants Defendants' motion for summary judgment on Jackson's due process claim.[7]

<strong>CONCLUSION</strong>

For the foregoing reasons, the Court grants in part and denies in part Defendants' motion for summary judgment [49]. The Court grants Defendants' motion on Jackson's due process claim and denies Defendants' motion on his Eighth Amendment claim.

Dated: January 18, 2023

SARA L. ELLIS
United States District Judge

---

[7] Defendants also argue that qualified immunity protects them from Jackson's due process claim. Because the Court has granted summary judgment on the merits of the claim itself, the Court need not address this argument.

17